*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0076p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

SCOTT ALLEN MCDANIEL (03-1940) and GREGORY WARREN WADE (03-2073),

        *Defendants-Appellants.*

Nos. 03-1940/2073

>

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 02-00147—Robert Holmes Bell, Chief District Judge.

Argued: January 25, 2005

Decided and Filed: February 17, 2005

Before: MOORE and GILMAN, Circuit Judges; GWIN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Craig A. Frederick, Grand Rapids, Michigan, Melvin Houston, Detroit, Michigan, for Appellants. Joan E. Meyer, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Craig A. Frederick, Grand Rapids, Michigan, David L. Kaczor, Grand Rapids, Michigan, for Appellants. Daniel Y. Mekaru, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. The instant appeal arises out of Defendants-Appellants Gregory Warren Wade's ("Wade") and Scott Allen McDaniel's ("McDaniel") convictions for conspiracy, theft of U.S. mail, and bank fraud. McDaniel contends on appeal that the district court erred in ruling that testimony by the Postal Inspector regarding statements made by McDaniel during the course of the Postal Inspector's investigation was inadmissible. McDaniel also urges this court to vacate his sentence and remand the case to the district court for resentencing in light of the Supreme Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005).

_____

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1

Wade similarly requests that this court vacate his sentence and remand the case to the district court for resentencing in light of *Booker*. Wade also argues that the district court erred in calculating the amount of restitution owed and that the district court misapplied the United States Sentencing Guidelines ("Guidelines") by: (1) assessing a two-point offense-level enhancement based on the extent of Wade's involvement in the conspiracy, and (2) increasing Wade's offense level by four points due to the amount of loss involved. For the reasons set forth below, we **AFFIRM** the district court's refusal to permit McDaniel's counsel to elicit testimony from the Postal Inspector regarding statements made by McDaniel, and we **VACATE** both McDaniel's and Wade's sentences and **REMAND** the cases to the district court for resentencing in light of *Booker*.

## I.  FACTUAL AND PROCEDURAL HISTORY

In 2001, Wade was incarcerated in the Kent County Jail, serving a sentence for a prior, unrelated charge. During this period of incarceration, Wade met Donald Hardy ("Hardy"), to whom he outlined a plan to steal outgoing U.S. mail containing personal checks and then to cash the checks after altering the payees and dollar amounts. Following their release from the Kent County Jail, Wade and Hardy proceeded to carry out this scheme.

It appears that Wade directly participated in the theft and alteration of twenty-three checks, for a total sum estimated at $19,407.93. Twenty-one of these checks (totaling approximately $17,538.70) were altered so that Wade was listed as the payee; Wade shared the proceeds of one of these checks, which had a payment amount of $1,094.48, with Hardy. Wade jointly stole and altered the two remaining checks with Hardy and two of Hardy's friends (Cindy Koops and her brother, Jody Koops). One of these checks listed Cindy Koops as the payee; although this check could not be located by the Postal Inspector, its value has been estimated at approximately $930. The second check, listing Jody Koops as the payee, totaled $939.23. Thus, the three checks Wade shared with Hardy amounted to approximately $2,963.71.

On November 8, 2001, Wade was arrested for uttering and publishing in violation of Michigan law. *See* MICH. COMP. LAWS § 750.249 (making it a crime to "utter and publish as true, any false, forged, altered or counterfeit record, deed, instrument or other writing . . ., knowing the same to be false, altered, forged or counterfeit, with intent to injure or defraud"). On April 15, 2002, Wade pleaded guilty in the Twentieth Circuit Court in Grand Haven, Michigan and was sentenced to 180 days' imprisonment, $766.00 in fines and costs, and $725.00 in restitution. On May 29, 2002, Wade pleaded guilty in the Seventeenth Circuit Court in Grand Rapids, Michigan, receiving a sentence of ten months' imprisonment and $22,258.00 in fines, costs, and restitution. It appears that these convictions pertained only to the twenty-one checks (totaling $17,538.70) that listed Wade as the payee and did not involve the two checks Wade jointly stole with Hardy and the Koops.

Following Wade's arrest, Hardy continued the check-fraud scheme, recruiting several other persons, including McDaniel, to assist in the enterprise. After receiving several reports of stolen mail in Kent County, Michigan, the United States Postal Service launched an investigation that led to the arrest of six persons, all of whom named Hardy as the source of the fraudulent checks. Ultimately, the investigation revealed that, over a period of six months, Hardy and twelve of his recruits had stolen thirty-six checks and had defrauded various financial institutions of approximately $43,136.66.

On October 9, 2002, a superseding indictment was filed in the United States District Court for the Western District of Michigan charging nine people, including Wade and McDaniel, with conspiring to steal U.S. mail and to commit bank fraud, in violation of 18 U.S.C. §§ 371, 1708, and

1344.[1] Six of the defendants entered into plea agreements with the Government, while Wade, McDaniel, and a third defendant were tried together before a jury. On April 25, 2003, the jury found Wade and McDaniel guilty of conspiracy, theft of U.S. mail, and bank fraud. On July 17, 2003, McDaniel was sentenced to forty-eight months' imprisonment, five years' supervised release, and $28,596.47 in restitution, and on July 24, 2003, Wade was sentenced to thirty-six months' imprisonment, three years' supervised release, and $17,538.70 in restitution. Wade and McDaniel timely appealed to this court.

## II. ANALYSIS

### A. Inadmissibility of Postal Inspector Cross-Examination Testimony

McDaniel appeals his conviction on the ground that the district court erred in barring his counsel from eliciting testimony from Postal Inspector Patricia Locke ("Postal Inspector Locke") on cross-examination regarding statements McDaniel made to Postal Inspector Locke during the course of her investigation. "In reviewing a trial court's evidentiary determinations, this court reviews de novo the court's conclusions of law, e.g., the decision that certain evidence constitutes hearsay, and reviews for clear error the court's factual determinations that underpin its legal conclusions." *United States v. Reed*, 167 F.3d 984, 987 (6th Cir.), *cert. denied*, 528 U.S. 897 (1999) (citations omitted). This standard is consistent with the Supreme Court's admonition in *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997), that we review evidentiary decisions for an abuse of discretion, because it is an abuse of discretion to make errors of law or clear errors of factual determination. *See United States v. Jones*, 107 F.3d 1147, 1153-54 (6th Cir. 1997). We conclude that the district court did not err in deeming McDaniel's statement to Postal Inspector Locke inadmissible hearsay.

Prior to trial, the Government filed a motion *in limine* requesting that the district court "prohibit any defense counsel from eliciting exculpatory statements of any defendant during the cross examination of any prosecution witness during the trial of this case." Joint Appendix ("J.A.") at 53 (Apr. 17, 2003 Mot. in Limine at 1). The district court granted the Government's motion, agreeing that "these types of statements are inadmissible hearsay." J.A. at 61 (Apr. 17, 2003 Order Granting Mot. in Limine). At trial, before beginning his cross-examination of Postal Inspector Locke, counsel for McDaniel informed the court (outside the presence of the jury) that "[his] client gave a statement to Inspector Locke, and in essence [he] would like to be able to question her about it." J.A. at 181 (Trial Tr. at 354). McDaniel's counsel proceeded to describe for the district court the contents of McDaniel's statement to Postal Inspector Locke, asserting that McDaniel's statement contained both inculpatory and exculpatory information. When asked by the district court why he would want to introduce inculpatory statements by his client, McDaniel's counsel explained that he "want[ed] the jury to know that [McDaniel] came forward when asked to come forward, that he admitted to his involvement in it and what his involvement was." J.A. at 184 (Trial Tr. at 357). After hearing arguments from both McDaniel's counsel and the Government, the district court denied the request to cross-examine Postal Inspector Locke regarding statements McDaniel made to her.

Federal Rule of Evidence 802 establishes that "[h]earsay is not admissible except as provided by [the Federal Rules of Evidence] or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." As the Supreme Court has explained, Rule 802 "is premised on the theory that out-of-court statements are subject to particular hazards. The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener." *Williamson v.*

---

[1]The original indictment, filed June 13, 2002, did not include charges against Wade.

*United States*, 512 U.S. 594, 598 (1994).  In contrast, "these dangers are minimized for in-court statements" because of "the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine." *Id.*

Not all out-of-court statements qualify as hearsay, however.  For instance, Federal Rule of Evidence 801(d)(2) excludes admissions by a party-opponent (which are offered against the party) from the definition of hearsay because the adversarial process allows the party-declarant to rebut his or her own admissions by testifying at trial.  *See* FED. R. EVID. 801(d)(2) & advisory committee's note ("Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule.").  Rule 801(d)(2), however, does not extend to a party's attempt to introduce his or her *own* statements through the testimony of other witnesses.[2]  *See United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996), *cert. denied*, 522 U.S. 934 (1997).  Indeed, if such statements were deemed admissible under Rule 801(d)(2), parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury.  *See United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000).

Turning to the testimony at issue in this case, it is clear that the district court correctly prohibited McDaniel's counsel from eliciting testimony from Postal Inspector Locke regarding certain statements made by McDaniel.  Whereas Rule 801(d)(2) authorized the Government to question Postal Inspector Locke on direct examination regarding statements made by McDaniel because of McDaniel's status as a party-opponent, any testimony by Postal Inspector Locke on cross-examination by McDaniel's counsel regarding additional statements made by McDaniel that had not already been introduced on direct examination would have constituted inadmissible hearsay that would have effectively allowed McDaniel to testify without being under oath, without cross-examination, and without direct scrutiny by the jury.  Thus, we see no basis for reversing McDaniel's conviction.

## B. Application of *United States v. Booker*

On January 12, 2005, while both McDaniel's and Wade's direct appeals were pending in this court, the Supreme Court issued its landmark ruling in *United States v. Booker*, 125 S. Ct. 738 (2005).  In light of *Booker*, we conclude that McDaniel's and Wade's Sixth Amendment rights have been violated and that we must vacate their sentences and remand their cases to the district court for resentencing.

### 1. Preservation of *Booker* Claim

In its final, parting words, the *Booker* Court provided some guidance to lower courts as to how to proceed in applying the *Booker* holdings to pending and future cases.  Although *Booker* instructs us to apply both its Sixth Amendment holding and its remedial holding to all cases on direct review, we have also been told to apply "ordinary prudential doctrines," such as plain error and

---

[2] We note that the admissibility of a statement under Rule 801(d)(2) does not hinge, as McDaniel appears to suggest, on whether or not the statement is against the party-declarant's interest.  *See United States v. Turner*, 995 F.2d 1357, 1363 (6th Cir.), *cert. denied*, 510 U.S. 904 (1993); *United States v. Reed*, 227 F.3d 763, 770 (7th Cir. 2000).  Indeed, McDaniel's proposed distinction between inculpatory and exculpatory statements appears to confuse Rule 801(d)(2) with Federal Rule of Evidence 804(b)(3), which establishes an exception to the hearsay rule when a declarant is unavailable to testify at trial and the declarant's statement "was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."  FED. R. EVID. 804(b)(3).

harmless error, in determining the appropriate disposition of *Booker*-based appeals. *Id.* at 769. Thus, before proceeding to consider the merits of McDaniel's and Wade's *Booker* claims, we must first determine whether McDaniel and Wade have preserved their *Booker* claims and, in turn, what standard of review applies to such claims.

As an initial matter, we conclude that neither McDaniel nor Wade has waived his right to raise a *Booker*-based challenge to his sentence. "[W]aiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks and citations omitted). Because neither *Booker* nor *Blakely* had been decided when McDaniel and Wade were sentenced or when the parties' briefs were due to this court, and because neither McDaniel nor Wade has taken any affirmative steps manifesting an intention to relinquish or abandon *Booker* rights, our review of McDaniel's and Wade's *Booker* claims is not foreclosed by the waiver doctrine. *See United States v. Stines*, 313 F.3d 912, 917 (6th Cir. 2002) (concluding that claims based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), had not been waived, explaining that "[i]t would have been impossible for the defendants to have intentionally relinquished or abandoned their *Apprendi* claims considering *Apprendi* was decided after they were sentenced"), *cert. denied*, 540 U.S. 973 (2003).

While it is clear that neither McDaniel nor Wade has waived his *Booker* rights, whether they have forfeited their *Booker* claims (thereby requiring plain-error review) or whether they preserved them in the district court below (thereby requiring de novo review) is a closer question. The Government contends that we must apply the plain-error test because neither McDaniel nor Wade raised *Apprendi-* or *Blakely*-based challenges in the district court[3] or in his brief on appeal.[4] We note, however, that Wade and McDaniel both raised objections in the district court to their Presentence Reports ("PSRs"), challenging the proposed application of various sentencing enhancements. *See United States v. Strayhorn*, 250 F.3d 462, 467 (6th Cir. 2001) (reviewing defendant's *Apprendi* claim de novo because the defendant "preserved his challenge by repeatedly objecting to the drug quantity determination at his plea hearing and at his sentencing hearing, as well as in a written objection to the calculation of his base offense level in his presentence report"), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002); *see also Stines*, 313 F.3d at 917 ("In order to preserve an *Apprendi* challenge, the defendants need not utter the words 'due process' as long as it is well known that they dispute the district court's factual findings as to drug quantity.") (internal quotation marks and citation omitted). *But see United States v. Davis*, — F.3d —, No. 03-4114, slip op. at 9 (6th Cir. Feb. 9, 2005) (not addressing *Strayhorn* or *Stines*, but stating that, "Although Defendant vehemently objected to the amount of loss before the district court, he failed to do so on Sixth Amendment grounds. Defendant raised a Sixth Amendment argument for the first time on appeal, following the issuance of *Blakely*; thus, we review Defendant's sentence for plain error."). Thus, there is some indication that McDaniel's and Wade's *Booker* claims may have not been forfeited and that we should review such claims de novo. We need not resolve this issue in this case, however, because we conclude that, even under plain-error review, we must vacate McDaniel's and Wade's sentences and remand their cases to the district court for resentencing.

---

[3]This comes as little surprise given the prior statements of this court that *Apprendi* did not invalidate the federal Sentencing Guidelines. *See United States v. Koch*, 383 F.3d 436, 440 (6th Cir. 2004) (en banc) (collecting cases and noting that "our Circuit has consistently turned back Sixth Amendment challenges to Guideline enhancements so long as the resulting sentence falls below the congressionally-prescribed statutory maximum"), *overruled by Booker*, 125 S. Ct. 738.

[4]This, too, comes as little surprise because *Blakely* and *Booker* were decided after the parties' proof briefs were due to this court.

## 2. Plain-Error Review

In order for an appellate court to reach the merits of a forfeited claim, "there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotation marks and citations omitted); *see* FED. R. CRIM. P. 52(b); *United States v. Oliver*, — F.3d —, No. 03-2126, 2005 WL 233779, at *6 (6th Cir. Feb. 2, 2005). We conclude that both McDaniel's and Wade's claims satisfy the necessary conditions for plain-error review, and we exercise our discretion to entertain these claims on appeal.

First, we conclude that errors occurred in both McDaniel's and Wade's sentencings. In *Blakely*, the Supreme Court ruled that a defendant's Sixth Amendment "right to have the jury find the existence of 'any particular fact' that the law makes essential to his punishment . . . is implicated whenever a judge seeks to impose a sentence that is not solely based on 'facts reflected in the jury verdict or admitted by the defendant.'" *Booker*, 125 S. Ct. at 749 (quoting *Blakely v. Washington*, 124 S. Ct. 2531, 2536-37 (2004)). In *Booker*, the Supreme Court extended *Blakely*'s Sixth Amendment holding to the federal sentencing Guidelines, *see id.*, and reiterated its holding in *Apprendi* that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by the plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 756.

Here, the Sixth Amendment rights of McDaniel and Wade were violated during the sentencing process because the district court relied on judge-found facts to impose sentencing enhancements that could not have been imposed based solely on facts found by the jury beyond a reasonable doubt. McDaniel was convicted of one count of conspiracy to steal U.S. mail and commit bank fraud, two counts of theft of U.S mail, and two counts of bank fraud, resulting in a base offense level of six. The district judge then imposed three enhancements that increased McDaniel's offense level to sixteen: (1) a four-point enhancement pursuant to United States Sentencing Guideline ("U.S.S.G.") § 2B1.1(b)(1)(C) for an amount of loss greater than $10,000 and less than $30,000,[5] (2) a four-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(B) because the offense involved fifty or more victims, and (3) a two-point enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 based on McDaniel's failure to comply with bond conditions and his failure to appear at a show-cause hearing. The district judge determined that the applicable sentencing range was 46 to 57 months' imprisonment and imposed a 48-month sentence. Had McDaniel's offense level been calculated based solely on the jury's verdict and not on additional facts found by the district judge, however, the applicable Guidelines range would have been 12 to 18 months' imprisonment. Thus, under *Booker*, McDaniel's Sixth Amendment rights were violated, and the district court erred in its sentencing of McDaniel. *See Davis*, No. 03-4114, slip op. at 9 (identifying Sixth Amendment *Booker* violation in context of amount-of-loss enhancement).

Wade's Sixth Amendment rights similarly were violated by the district court's increasing Wade's sentence based on judge-found facts. Wade was convicted of one count each of conspiracy to steal U.S. mail and to commit bank fraud, theft or receipt of stolen mail matter, and bank fraud. This resulted in Wade having a base offense level of six, which was then increased to a total offense level of sixteen based on three sentencing enhancements: (1) a four-point enhancement pursuant

---

[5]McDaniel's convictions for theft of U.S. mail and bank fraud pertained to two specific checks totaling $2,300.10. Thus, the four-point enhancement for amount of loss imposed by the district court could not have been based on the jury's verdict alone.

to U.S.S.G. § 2B1.1(b)(1)(C) for an amount of loss greater than $10,000 and less than $30,000,[6] (2) a four-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(B) because the offense involved fifty or more victims, and (3) a two-point enhancement pursuant to U.S.S.G. § 3B1.1(c) for being an organizer, leader, manager, or supervisor. Wade was sentenced to 36 months' imprisonment, which was within the applicable Guidelines range of 33 to 41 months. Wade's sentence violated the Sixth Amendment, however, because if the district judge had relied only on facts found by the jury, the applicable Guidelines range for Wade's sentence would have been 6 to 12 months' imprisonment. Thus, the first condition for plain-error review has been satisfied in Wade's case as well.

Next, we conclude that the errors committed by the district court in sentencing McDaniel and Wade are "plain," i.e., "clear" or "obvious." *Olano*, 507 U.S. at 734. Although the constitutional infirmity of the Guidelines may not have been clear or obvious at the time McDaniel and Wade were sentenced, *see United States v. Koch*, 383 F.3d 436, 440 (6th Cir. 2004) (en banc), *overruled by Booker*, 125 S. Ct. 738, "it is enough that an error be 'plain' at the time of appellate consideration." *Johnson*, 520 U.S. at 468; *see Oliver*, 2005 WL 233779, at *7. We see no relevant distinction between the Sixth Amendment violation that occurred in the sentencing of Freddie Booker and the Sixth Amendment concerns raised by the manner in which McDaniel and Wade were sentenced; thus, the errors here are plain. *See Oliver*, 2005 WL 233779, at *7.

Third, in order for us to reach the merits of McDaniel's and Wade's *Booker* claims, we must find that the district court's "plain errors" affected McDaniel's and Wade's substantial rights. *See Olano*, 507 U.S. at 734. In *Oliver*, we recognized that:

> the district court's sentencing determination unconstitutionally increased [the defendant]'s sentence beyond that which was supported by the jury verdict and [the defendant]'s criminal history. As a result [the defendant] arguably received a sentence that was longer than his sentence would have been absent a Sixth Amendment violation. We must therefore conclude that this sentencing error affected [the defendant]'s substantial rights.

2005 WL 233779, at *8; *see Davis*, No. 03-4114, slip op. at 10. Likewise, in this case, McDaniel's sentence of 48 months' imprisonment was more than double the maximum sentence he could have received under the Guidelines based on the jury's verdict alone, and Wade's sentence of 36 months was three times longer than the maximum Guidelines sentence supported by the jury's fact-finding. Thus, both McDaniel's and Wade's substantial rights were affected by the district court's plain Sixth Amendment errors in sentencing.

Having concluded that the district court's plain error affected McDaniel's and Wade's substantial rights, we finally must determine whether the errors below "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," such that we should exercise our discretion to review McDaniel's and Wade's *Booker* claims. *Olano*, 507 U.S. at 736 (internal quotation marks and citation omitted). As we explained in *Oliver*, "A sentencing error that leads to a violation of the Sixth Amendment by imposing a more severe sentence than is supported by the jury verdict would diminish the integrity and public reputation of the judicial system and also would diminish the fairness of the criminal sentencing system." 2005 WL 233779, at *8 (internal quotation marks and citation omitted); *see Davis*, No. 03-4114, slip op. at 10; *accord United States v. Hughes*,

---

[6]Wade's convictions for theft or receipt of stolen mail matter and bank fraud pertained to a single check for $939.23. Thus, the four-point enhancement for amount of loss imposed by the district judge could not have been based on the jury's verdict alone.

— F.3d —, No. 03-4172, 2005 WL 147059, at *5 (4th Cir. Jan. 24, 2005).[7] Thus, we exercise our discretion to entertain McDaniel's and Wade's *Booker* claims.

### 3. Remedy

Having determined that the district court erred in sentencing McDaniel and Wade in a manner contrary to their Sixth Amendment rights, we conclude that we must remand McDaniel's and Wade's cases to the district court for resentencing. *See Booker*, 125 S. Ct. at 769 (agreeing with the Seventh Circuit that "Booker's sentence violated the Sixth Amendment" and affirming that circuit's decision to vacate the district court's judgment and remand Booker's case for resentencing); *Oliver*, 2005 WL 233779, at *8; *Davis*, No. 03-4114, slip op. at 10.  As we explained in *Oliver*:

> [E]ven if we conclude that the evidence [supporting a district judge's pre-*Booker* sentencing determination] is overwhelming and essentially uncontroverted, we cannot know the length of imprisonment that the district judge would have imposed pursuant to this evidence following *Booker*.  We would be usurping the discretionary power granted to the district courts by *Booker* if we were to assume that the district court would have given [the defendant] the same sentence post-*Booker*.  A failure to remand this case to the district court for re-sentencing would therefore seriously affect the fairness and integrity of our judicial proceedings following the Supreme Court's decision in *Booker*.

2005 WL 233779, at *8 n.3 (internal quotation marks and citations omitted); *accord Hughes*, 2005 WL 147059, at *5 n.8; *cf. United States v. Crosby*, — F.3d —, No. 03-1675, 2005 WL 240916, at *11 (2d Cir. Feb. 2, 2005).[8]

---

[7] After our ruling in *Oliver*, in the subsequent opinion *United States v. Bruce*, — F.3d —, No. 03-3110, 2005 WL 241254 (6th Cir. Feb. 3, 2005), another panel of this court declined to exercise its discretion and remand for resentencing a case in which the district court imposed a two-point offense level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice.  That panel based its decision on its determination that the evidence supporting the imposition of the obstruction-of-justice enhancement was "'overwhelming' and 'essentially uncontroverted,'" thus "defeat[ing] any claim that these findings 'seriously affected the fairness, integrity, or public reputation of judicial proceedings.'"  *Bruce*, 2005 WL 241254, at **17-18 (quoting *United States v. Cotton*, 535 U.S. 625, 633 (2002)).  We note, however, that such a statement in *Bruce* is at odds with our prior ruling in *Oliver* that "even if we conclude that the evidence is overwhelming and essentially uncontroverted we cannot know the length of imprisonment that the district court judge would have imposed pursuant to this evidence following *Booker*. . . . A failure to remand . . . to the district court for re-sentencing would therefore seriously affect the fairness and integrity of our judicial proceedings following the Supreme Court's decision in *Booker*."  *United States v. Oliver*, — F.3d —, No. 03-2126, 2005 WL 233779, at *8 n.3 (6th Cir. Feb. 2, 2005) (internal quotation marks and citations omitted).  Thus, because *Oliver* was filed before *Bruce*, under our long-standing rules and precedent, *Oliver* controls.  *See, e.g.,* 6th Cir. R. 206(c) ("Reported panel opinions are binding on subsequent panels.  Thus, no subsequent panel overrules a published opinion of a previous panel.  Court en banc consideration is required to overrule a published opinion of the court."); *United States v. Davis*, — F.3d —, No. 03-4114, slip op. at 9 n.7 (6th Cir. Feb. 9, 2005); *see also Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. 2004) ("A panel of this court cannot overrule the decision of another panel.") (internal quotation marks and citation omitted).

[8] We further note that the argument for remand is especially strong in cases such as Wade's, in which the district judge specifically noted during sentencing his dissatisfaction with the constraints imposed by the Guidelines.  J.A. at 203 (Sentencing Hr'g Tr. at 13) ("THE COURT: . . . [A]gain, we're playing this numerical game, I will call it, of calculating total offense scores based upon the so-called Sentence Reform Act of 1986 which requires the Court to come to certain mathematical calculations, difficult to come to, and somehow try and achieve justice from these mathematical calculations.").

## C.  Guideline Interpretation

Although the *Booker* Court severed and rendered inapplicable 18 U.S.C. §§ 3553(b)(1) and 3742(e), which made adherence to the Guidelines mandatory, the *Booker* Court also explained that sentencing courts should continue to consider the recommended Guidelines sentence.  *See Booker*, 125 S. Ct. at 764; *see also* 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider . . . (4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission . . . .").  Thus, because the district court will need to consider the Guidelines-recommended sentences on remand, we take this opportunity to provide some guidance as to the proper interpretation of the Guidelines provisions whose application was challenged on appeal.[9]

### 1.  Role in the Offense (U.S.S.G. § 3B1.1)

In his appeal, Wade argues that the district court erred in imposing a two-point enhancement pursuant to U.S.S.G. § 3B1.1 for his leadership role in the conspiracy.  Based on the facts before us, we conclude that it would not be improper to apply a two-point § 3B1.1 enhancement when calculating Wade's Guidelines-recommended sentence.[10]

Section 3B1.1 provides for a two-to-four point increase of a defendant's offense level based on the extent of a defendant's leadership or management in a criminal conspiracy.  Application Note four of § 3B1.1 explains that:

> In distinguishing a leadership and organizational role from one of mere management or supervision, . . . [f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.  This adjustment does not apply to a defendant who merely suggests committing the offense.

Thus, as the Guidelines commentary suggests, an increase in a defendant's offense level is appropriate where the defendant planned the conspiracy and helped recruit accomplices to participate.

---

[9]We emphasize, however, that our discussion of these Guidelines provisions should not be construed as requiring the district court to impose a sentence reflecting these enhancements or as speaking to the ultimate reasonableness of the sentences the district court orders on remand.

[10]As we noted in *United States v. Henley*, 360 F.3d 509, 516 (6th Cir. 2004), "[t]he proper standard of review to employ in evaluating the district court's imposition of this enhancement is subject to some debate."  Traditionally, when we reviewed a district court's imposition of a § 3B1.1 enhancement, we reviewed the district court's factual findings for clear error and its legal conclusions de novo.  *See id.*  In 2001, however, the Supreme Court ruled in *Buford v. United States* that, "in light of the fact-bound nature of the legal decision," an appellate court should review deferentially, rather than de novo, a district court's application of U.S.S.G. § 4B1.2. 532 U.S. 59, 66 (2001).  We have previously found it unnecessary to determine whether *Buford* requires us to alter the standard of review we apply in reviewing § 3B1.1 enhancements because we would have affirmed the district court's sentencing determination under either standard, *see United States v. Swanberg*, 370 F.3d 622, 629 (6th Cir. 2004); *Henley*, 360 F.3d at 516, and we similarly find no need to resolve the question in this case, especially because we are merely providing advice to the district court to guide its sentencing determination on remand.

Here, the record indicates that, although the district court found Hardy to be the central organizer and leader in the conspiracy, Wade still had "an organizational hand" in the conspiracy. J.A. at 206 (Sentencing Hr'g Tr. at 16). Wade taught Hardy the mechanics of the check fraud scheme (including how to steal the checks, wash them in acetone, and alter their payees and amounts), and Wade suggested that he and Hardy use third parties to cash the fraudulent checks. In *United States v. Nguyen*, a case factually similar to the one at bar, we upheld a three-level enhancement for a defendant who "recruited individuals to participate in the illegal scheme, provided counterfeit checks to them, and collected proceeds from those checks." No. 00-3852, 2001 WL 1110107, at *6 (6th Cir. Sept. 13, 2001). We have also affirmed the imposition of leadership enhancements when the defendant's expertise was critical to making the operation possible. *See United States v. Kelly*, 204 F.3d 652, 658 (6th Cir.), *cert. denied*, 530 U.S. 1268 (2000). Thus, the record indicates that it would not be a misapplication of § 3B1.1 to include in the calculation of Wade's Guidelines-recommended sentence a two-point increase in the offense level based on Wade's role in the conspiracy.

### 2. Amount of Loss (U.S.S.G. § 2B1.1(b)(1)(C))

Wade also argues on appeal that the district court erred in increasing his offense level by four points based on a determination by the district judge that the amount of loss as a result of the offense was between $10,000.00 and $30,000.00. After reviewing the record, we make the following observations.

The federal indictment at issue here charged a total of nine individuals, who collectively stole thirty-six checks, with defrauding financial institutions of a total of $43,136.66. Of this total, Wade was directly involved in the theft of only one check: the October 13, 2001 check for $939.23, cashed by Jody Koops. The PSR did not recommend that the loss attributable to Wade be equal to the total loss charged to the conspiracy in the indictment, but rather recommended that Wade be charged with an amount of loss of $21,178.24. The probation office reached such a determination by adding $17,538.70, the value of the checks upon which Wade's state-court convictions were based; the October 13, 2001 check for $939.23, cashed by Jody Koops; a November 2, 2001 check for $900.00 cashed by a Mr. Norton; a November 11, 2001 check for $900.31, also cashed by Mr. Norton; and a November 11, 2001 check for $900.00, cashed by Arthur Walls.[11] The district court, however, did not adopt the PSR's recommendation, stating that

> as a matter of academics here, the question of amount of loss that should be attributable to Mr. Wade should have backed out from this the checks that were used as part of the prosecution in the state case. I don't know if there's any law on the fact, but justice just says that that's not fair. It's just not fair. So the Court will conclude that the amount of loss attributable to Mr. Wade is $17,538.70.

J.A. at 204 (Sentencing Hr'g Tr. at 14). In other words, despite finding that the checks involved in Wade's prior state-court convictions should *not* be included in the amount-of-loss calculation, the district court concluded that the amount of loss attributable to Wade was $17,538.70, i.e., the total amount covered by the state-court convictions. Thus, it appears that the district judge may have

---

[11]The probation office's basis for selecting these checks for inclusion in the amount-of-loss calculation is somewhat unclear, as Wade was involved directly with only one of these checks (i.e., the October 13, 2001 check for $939.23), and two of these checks were cashed on November 11, 2001, three days after Wade was arrested. In addition, the probation office's list of checks does not include two checks with which Wade was directly involved and which were not included in his state-court convictions (i.e, the October 12, 2001 check for $1,094.48 which Wade cashed and shared with Hardy, and the October 13, 2001 check, estimated at $930.00, which Cindy Koops cashed and shared with Wade and Hardy).

misspoken when stating that the amount of loss was $17,538.70 and not $3,639.54, the total of the remaining four checks included in the PSR's amount-of-loss recommendation.

We also note that, strictly as a matter of Guidelines interpretation, the $17,538.70 in losses included in Wade's state-court convictions qualify as relevant conduct for purposes of determining amount of loss. Indeed, the Guidelines specifically address a situation virtually identical to the one at bar:

> The defendant engaged in two cocaine sales constituting part of the same course of conduct or common scheme or plan. Subsequently, he is arrested by state authorities for the first sale and by federal authorities for the second sale. He is convicted in state court for the first sale and sentenced to imprisonment; he is then convicted in federal court for the second sale. In this case, the cocaine sales are not separated by an intervening sentence. Therefore, under subsection (a)(2), the cocaine sale associated with the state conviction is considered as relevant conduct to the instant federal offense. The state prison sentence for that sale is not counted as a prior sentence; *see* § 4A1.2(a)(1).

U.S.S.G. § 1B1.3 application n.8, ex.2. Here, the modus operandi (stealing mail, washing checks in acetone, and altering the checks' payees and amounts), the victims (financial institutions in the Grand Rapids, Michigan area), and the time period (fall 2001) involved in Wade's state and federal prosecutions were the same. *See* U.S.S.G. § 1B1.3 application n.9 ("For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*. . . . Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. [Relevant factors] include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses."). Thus, it appears that, for purposes of the Guidelines' amount-of-loss calculation, the checks forming the basis for Wade's state-court convictions would qualify as relevant conduct.

## D. Restitution

Finally, Wade has challenged on appeal the district court's order of restitution based on his purported inability to pay and the manner in which the amount was calculated.[12] Because we are vacating Wade's sentence and remanding his case for a redetermination of his entire sentence, which

---

[12]Although courts have generally recognized that Seventh Amendment jury trial rights do not apply when a criminal defendant is ordered to pay restitution, *see Kelly v. Robinson*, 479 U.S. 36, 53 n.14 (1986), and that *Apprendi* does not render the Mandatory Victims Restitution Act invalid under the Sixth Amendment, *see United States v. Bearden*, 274 F.3d 1031, 1042 (6th Cir. 2001), we note that there is some question as to whether *Booker* requires us to reconsider our analysis of criminal defendants' jury trial rights with respect to restitution orders. *Compare United States v. Tomlinson*, Nos. 03-50558 and 03-50559, 2004 WL 2296718, *1 (9th Cir. Oct. 8, 2004) (vacating and remanding restitution award because of "potential *Blakely* issues"), *with United States v. Garcia-Castillo*, 2005 WL 327698, No. 03-2166 (10th Cir. Feb. 11, 2005) (rejecting *Booker* challenge to restitution order but noting that "[w]hether restitution is criminal punishment and whether restitution is subject to *Apprendi*, *Blakely*, and *Booker* are by no means settled questions in courts across the country."); *United States v. DeGeorge*, 380 F.3d 1203, 1221 (9th Cir. 2004) (rejecting *Blakely* challenge to restitution order); *see also* 18 U.S.C. § 3664(e) ("Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."); *United States v. Durham*, 755 F.2d 511, 514 (6th Cir. 1985) (distinguishing cases rejecting Fifth and Seventh Amendment challenges to restitution orders on the ground that, "[i]n those cases, . . . the facts that gave rise to the restitution order were either elements of the offense charged or were fully adjudicated during the course of the trial leading to the defendant's conviction."). Because the parties did not address this important and complex question in their briefs or in oral argument, we express no opinion on the issue at this time.

includes the district court's order of restitution, we make the following observations to guide the district court on remand.

Title 18 U.S.C. § 3663A requires mandatory restitution for, *inter alia*, "offense[s] against property under this title . . ., including any offense committed by fraud or deceit."   18 U.S.C. § 3663A(c)(1)(A)(ii).  Wade's crime of bank fraud is one such offense for which restitution must be paid.  *See United States v. Jones*, 289 F.3d 1260, 1264 (11th Cir.), *cert. denied*, 537 U.S. 1049 (2002); *United States v. Behrman*, 235 F.3d 1049, 1052 (7th Cir. 2000); *see also United States v. Huff*, No. 02-2310, 2003 WL 23095560, at *2 (6th Cir. Dec. 11, 2003).  Because restitution ordered pursuant to § 3663A is mandatory, Wade's purported inability to pay does not impact the amount of restitution he must pay.  *See United States v. Schulte*, 264 F.3d 656, 661 (6th Cir. 2001) (citing 18 U.S.C. §§ 3663A(a)(1) and 3664(f)(1)(A)); *see also* 18 U.S.C. § 3664(f)(2) (directing courts, *after* determining the amount of restitution, to take into account a defendant's financial condition in preparing the defendant's schedule of payments); 18 U.S.C. § 3664(k) (requiring defendant to notify court of changes in financial condition so that the restitution payment schedule may be adjusted or a demand for immediate payment in full can be made).

We do note, however, that the basis for the amount of restitution ordered in Wade's case is somewhat unclear.  In its PSR, the probation office recommended that Wade be ordered to pay restitution of $3,639.55 to Fifth Third Bank and Bank One, pursuant to 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1.  The PSR also noted that Wade had been ordered to pay restitution by Michigan's 17th and 20th Circuit Courts.  The district judge did not adopt the PSR's recommendation as the amount of restitution to be paid by Wade, but rather ordered that Wade pay $17,538.70 to Macatawa Bank, Huntington Bank, Fifth Third Bank, Byron Center State Bank, National City Bank, and River Valley Credit Union.  Thus, like the amount-of-loss determination discussed above, the amount of restitution ordered and the payees listed in the district court's judgment appear to be based on those checks underlying Wade's state-court convictions.  Although § 3663A(a)(2) expansively defines a "victim," to whom restitution must be paid, as including "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern," the restitution statutes do not permit victims to obtain multiple recoveries for the same loss.  *See* 18 U.S.C. § 3664(j)(2); *see also* U.S.S.G. § 5E1.1(b)(1).  Because it appears that Michigan's 17th and 20th Circuit Courts have already ordered Wade to pay restitution to his state-court victims, the district court on remand should make clear in its order of restitution that in no case should Wade be required to make restitution payments to any state-court victims who have already received full restitution for their losses.

## III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** McDaniel's conviction, we **VACATE** both McDaniel's and Wade's sentences, and we **REMAND** McDaniel's and Wade's cases to the district court for resentencing consistent with *Booker* and this opinion.