NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0540n.06

No. 12-5974

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

May 31, 2013

DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee*,

v.

ELMER MELESIO,

    *Defendant-Appellant*.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

**O P I N I O N**

BEFORE:    COLE, and COOK, Circuit Judges, KATZ, District Judge.[*]

COLE, Circuit Judge.  Defendant-Appellant Elmer Melesio was charged with aiding and abetting possession with intent to distribute and distribution of methamphetamine under 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) and (b)(1)(A), after he sold over fifty grams of methamphetamine to an undercover police officer.  Melesio pleaded guilty without a plea agreement and was sentenced to 262 months imprisonment.  He now appeals his sentence, arguing that the district court improperly applied a four-point adjustment for his role as an organizer or leader under U.S. Sentencing Guideline § 3B1.1(a).  For the following reasons, we affirm.

I.

In August 2010, the Drug Enforcement Agency ("DEA") began to investigate Melesio and others for suspected involvement in a narcotics conspiracy in Western Kentucky.  By 2011, DEA

---

[*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

agents had uncovered evidence that the supplier for methamphetamine in this conspiracy was a thirty to forty-year-old Hispanic male who lived in Chicago and went by the alias "Uncle." "Uncle" was later identified as Melesio, the Defendant. Agents with the DEA soon gathered enough information to establish contact with Melesio by text message and undercover agents negotiated arrangements for a methamphetamine drop worth $5,000. Melesio agreed to hand-deliver the drugs to the agents.

On October 28, 2011, officers received a text message from Melesio telling them that he had arrived in Kentucky and was ready to make the sale. Surveillance revealed that Melesio was accompanied by a second man, Jose Perez, the driver of the vehicle. Agents met Melesio at a Burger King restaurant in Murray, Kentucky. Melesio and Perez then followed agents to a nearby location where hidden audio and video surveillance had been set up to record the drug exchange. In view of the cameras, agents then proceeded to purchase $5,000 worth of methamphetamine—eventually measured to be 238.4 grams—from Melesio, while Perez stood "look-out."

After the transaction, Melesio and Perez were permitted to drive away while the DEA field-tested the packages for methamphetamine. The tests came back positive. Melesio and Perez were stopped and arrested shortly thereafter. Perez indicated that he had been recruited by Melesio as a driver in exchange for a loan.

Subsequent investigation into Melesio revealed greater ties to the methamphetamine distribution network. In one related case, Timothy Chambers, a methamphetamine distributor, pleaded guilty to receiving 20 to 45 ounces of methamphetamine every other week for a year and a half. "It was discovered that Mr. Chambers's source of supply was a Mexican male from Chicago named Elmer Melesio, a/k/a 'Uncle,' who was assisted by at least two couriers (who were later

identified as Maria Tapia and Ezequial Flores-Garcia . . .)." Since September 2010, Melesio had been Chambers's only supplier. Tapia and Flores-Garcia were also charged in a related case and pleaded guilty to a single-charge indictment. Chambers, Tapia and Flores-Garcia all identified "Uncle" as the supplier of the methamphetamine.

Investigations also revealed that Melesio had been supplying methamphetamine to Daniel Eric Copeland, a distributor who faced federal drug charges in a related case. Copeland also independently identified Melesio as his supplier. In all, Melesio was found to be responsible for supplying individuals with 12.74 kilograms of methamphetamine (mixture) and 677.4 grams of methamphetamine (actual).

Melesio pleaded guilty to distributing 238.4 grams of methamphetamine but objected to the portions of the Presentence Investigation Report ("PSR") that connected him to and identified his role as a methamphetamine distributor in the cases of Chambers, Tapia, Flores-Garcia, Copeland, and two other persons. Melesio argued that "there is not credible evidence other than the self serving statements by various criminal defendants claiming a connection to the Defendant," to support the PSR's factual conclusions that he was responsible for supplying methamphetamine to Chambers, Copeland, Tapia, and Flores-Garcia and had a greater role in the drug ring.

The United States Probation Office left the PSR unchanged: "Investigative material provided by the Drug Enforcement Administration shows that the defendant was identified individually and on separate occasions by Timothy Chambers, Daniel Eric Copeland, and Maria Tapia as 'Uncle,' the source of supply for the methamphetamine in their federal offenses." The PSR furthermore explained that these individuals were known to have met with Melesio in person, and that Melesio

had identified himself to DEA agents as "Uncle." The report concluded: "[T]he U.S. Probation Office believes that there is enough corroborating evidence to show that Mr. Melesio a/k/a 'Uncle' supplied methamphetamine to Timothy Chambers, Daniel Eric Copeland, Maria Tapia, and Ezequiel Flores-Garcia for the purpose of distribution."

At sentencing, following the recommendation of the PSR and concluding that Melesio qualified as a "leader or organizer" under U.S. Sentencing Guideline § 3B1.1(a), the district court applied a four-level aggravating role adjustment, making Melesio's total offense level 39. Melesio's counsel objected:

> I think if he were indicted under a conspiracy, then I think it would be more understandable how you can attribute all this other conduct [to] him . . . for sentencing purposes. [But here] he's admitted to conduct of 238 [kilograms of methamphetamine], that's what he's been indicted for, and then [the court has] triple[d] that amount through conduct that he's never had an opportunity to defend before a court or before a jury . . . he pled guilty to what he actually had done. It's all this other stuff that he [has] not ha[d] an opportunity to defend that has enhance[d his sentence].

His counsel noted that the court's application of the law was correct and stated that he was simply trying to express his client's "understanding of it." The court subsequently imposed a sentence of 262 months incarceration.

Melesio brought a timely appeal, arguing that (1) it was a violation of his constitutional rights under the Confrontation Clause for the district court to consider uncross-examined statements in establishing relevant conduct for purposes of imposing an adjustment under § 3B1.1(a) and (2) the evidence was not sufficient to establish that Melesio was an organizer or a leader of criminal activity

which involved five or more participants as required for the § 3B1.1(a) role adjustment to apply. We

address these issues in turn.

II.

Melesio first argues that his constitutional right to confront and cross-examine witnesses was

violated because he had no opportunity to cross-examine the persons whose information formed the

"relevant conduct" for purposes of the § 3B1.1(a) role adjustment. "Generally, we review alleged

violations of the Confrontation Clause de novo. If, however, a defendant does not object to an error

in the district court, plain-error review applies." *United States v. Powers*, 500 F.3d 500, 505 (6th

Cir. 2007) (citations omitted); *see also United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005)

(quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

While there is no indication that Melesio preserved a Confrontation Clause objection below,

his argument fails under either standard of review. This Court has long held

> both before and after adoption of the Guidelines . . . that the constitutional
> protections afforded defendants at a criminal trial, including confrontation rights, are
> not available at sentencing proceedings to limit the court's consideration of the
> background, character and conduct of the defendant.
>     So long as the evidence in the presentence report bears some minimal indicia
> of reliability in respect of defendant's right to due process, the district court, after
> adoption of the guidelines, may still continue to consider and rely on hearsay
> evidence without any confrontation requirement.

*United States v. Silverman*, 976 F.2d 1502, 1511 (6th Cir. 1992) (en banc) (internal quotation marks

omitted); *See also*, U.S.S.G. § 6A1.3(a) ("In resolving any reasonable dispute concerning a factor

important to the sentencing determination, the court may consider relevant information without

regard to its admissibility under the rules of evidence applicable at trial, provided that the

information has sufficient indicia of reliability to support its probable accuracy.") While relevant information must bear some "minimum indicia of reliability," this is a "relatively low hurdle." *United States v. Greene*, 71 F.3d 232, 235 (6th Cir. 1995). This determination is primarily factual. *United States v. Gibson*, 985 F.2d 860, 865 (6th Cir. 1993) (citation omitted). "The district court's factual findings must [have been] based on a preponderance of the evidence standard." *Greene*, 71 F.3d at 235. Our review is solely for clear error. *Id*.

The district court made sufficient factual findings and had sufficiently reliable information before it to meet the minimum indicia of reliability requirement. The court evaluated the evidence in the PSR and determined that it came to accurate conclusions. The court noted that "the defendant was identified individually on separate occasions by Timothy Chambers, Daniel Eric Copeland, and Maria Tapia as 'Uncle,' the source of supply for the methamphetamine." His co-defendant, Perez, with whom he was arrested, also identified him as "Uncle," the methamphetamine supplier. Finally, the court noted that Melesio "even confirmed his identity as 'Uncle' to the undercover officers during the transaction of the instant offense." We find no grounds upon which to find that that the district court's factual findings were clearly erroneous. Therefore, Melesio's Confrontation Clause claim fails.

### III.

Second, Melesio argues that the district court incorrectly determined that he was an organizer or a leader of criminal activity that involved five or more participants and improperly applied the § 3B1.1(a) role adjustment as a result.

This Court has yet to clarify the standard of review when a district court imposes a § 3B1.1(a) role enhancement. *United States v. McDaniel*, 398 F.3d 540, 551 n.10 (6th Cir. 2005). "Traditionally . . . we reviewed the district court's factual findings for clear error and its legal conclusions de novo." *Id.* (citation omitted). "In 2001, however. . the Supreme Court ruled . . . that, 'in light of the fact-bound nature of the legal decision,' an appellate court should review deferentially, rather than de novo, a district court's application of U.S.S.G. § 4B1.2." *Id.* (quoting *Buford v. United States*, 532 U.S. 59, 66 (2001)). We conclude that under either standard of review Melesio's argument fails. *See United States v. Walls*, 546 F.3d 728, 734 (2008) (reserving the question of which standard of review to apply).

"Under § 3B1.1(a), a defendant's offense level should be increased by four levels '[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]'" *Id.* (quoting U.S.S.G. § 3B1.1(a)). "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 application note 2; *see also United States v. Vanderberg*, 201 F.3d 805, 811 (6th Cir. 2000) ("In general, a defendant must have exerted control over at least one individual within a criminal organization for the enhancement of § 3B1.1 to be warranted." (citation and internal quotation marks omitted)).

A § 3B1.1 adjustment varies between a two-level and four-level enhancement. Factors to be considered when determining the level of the § 3B 1.1(a) enhancement include:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or

> organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*McDaniel*, 398 F.3d at 551 (quoting U.S.S.G. § 3B1.1 application note 4).

Melesio's only arguments on appeal are that he (1) did not have control over five persons, and (2) that there is no evidence that he made drug transactions in Kentucky. Even if these assertions are in fact true, they have no bearing on the application of § 3B1.1 to his sentence.

In order for § 3B1.1 to apply, Melesio must have had control over at least one person. Melesio does not appear to contest that he had control over and recruited Jose Perez, the driver of his car when he was arrested. The evidence additionally demonstrated that he hired Tapia and Flores-Garcia as couriers to carry drugs from Chicago to Kentucky. Melesio makes no argument regarding insufficiency of the evidence as to his control over Tapia or Flores-Garcia. While Melesio does contend that the evidence was insufficient to show that he had control over any additional persons, § 3B1.1 only requires control over one other individual. Because it was shown by a preponderance of the evidence that he had control over at least three individuals, § 3B1.1 applies.

Melesio seems to confuse the number of persons who must be "controlled" and the number of persons who must simply be "involved" in the criminal activity. In order for § 3B1.1 to apply, at least five persons must have been "involved" in the criminal activity. *See* U.S.S.G. § 3B1.1(a). Even if, however, we assume that Melesio contends that there was not enough evidence to demonstrate that five persons were involved in the conspiracy to sell methamphetamine, his argument still fails. In addition to Flores-Garcia, Tapia, and Perez, the district court found that Melesio was the supplier to—even if not in control of—Copeland and Chambers. Including

Melesio, that brings the headcount to six—with Melesio having exercised control over three. We thus find that the district court did not commit clear error with regard to its factual finding that five or more participants were involved in the conspiracy. *See United States v. Hazelwood*, 398 F.3d 792, 795 (6th Cir .2005).

Melesio's second argument—that he did not engage in drug-related conduct in Kentucky— appears to simply reframe his Confrontation Clause objection: that he should not have been sentenced for crimes to which he did not plead guilty or for which he had no trial. In sum, Melesio contends that he is innocent of the drug crimes, which occurred in Kentucky, which form the "relevant conduct" for the § 3B1.1(a) adjustment. This claim similarly fails. The district court properly considered the relevant § 3B1.1(a) enhancement factors before imposing the four-point role adjustment to Melesio's sentence. There was a preponderance of evidence to show that Melesio had recruited at least several people, was an active decision maker, and had substantial authority over others. Here, the district court did not err in imposing the § 3B1.1(a) role enhancement.

IV.

For the foregoing reasons, we affirm.