NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 09a0601n.06

No. 08-1168

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JAMAL ELLEDGE,

    Defendant-Appellant.

_____ /

FILED
Aug 25, 2009
LEONARD GREEN, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE:    CLAY and ROGERS, Circuit Judges, and JORDAN, District Judge.[*]

    **CLAY, Circuit Judge.** Defendant-Appellant Jamal Elledge appeals his 132-month sentence of imprisonment after a jury found him guilty of conspiracy to distribute and conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846, and of attempted possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. On appeal, Elledge argues that the sentencing court erred in determining the drug quantity underlying his offense level, that the court erred in enhancing his sentence for his supervisory role in the offense, and that his sentence is procedurally unreasonable. For the reasons that follow, we **REVERSE** the district court's judgment and **REMAND** for resentencing.

_____

[*]The Honorable R. Leon Jordan, Senior United States District Judge for the Eastern District of Tennessee, sitting by designation.

## BACKGROUND

### A.    Procedural History

In November of 2002, Defendant-Appellant Jamal Elledge ("Ellege") was indicted for conspiracy to distribute and possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One), and for attempted possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count Two).  His case proceeded to a jury trial and on October 26, 2005, he was found guilty of both counts.  He was initially sentenced to concurrent terms of 262 months of imprisonment on each count, but while his direct appeal was pending, he entered into a stipulation with the government, and this Court entered an order dismissing the appeal and remanding the case for resentencing.  A second sentencing hearing was held on November 8, 2007, and the court sentenced Elledge to 132 months of imprisonment to run concurrently on both counts, with credit for time served.  Elledge filed a timely notice of appeal.

### B.    Substantive Facts

On November 10, 2002, law enforcement stopped a rental van in Phelps County, Missouri.  The driver and passenger, Eric Sander and Nigest Solomon, consented to a search of the vehicle, and officers found what was later determined to be 297 pounds (gross weight) of marijuana in the back of the van.  Sander and Solomon agreed to cooperate with the authorities and stated that an individual they knew as "Jay" (later identified as defendant Jamal Elledge) had hired them to drive marijuana from Phoenix, Arizona to Detroit, Michigan.  They agreed to participate in a controlled delivery of the marijuana to "Jay" in the Detroit area.

With Solomon's consent, law enforcement monitored and/or recorded a number of phone conversations in which Elledge inquired as to the status of the trip, expressed frustration with delays, pressured Solomon "keep going," and told her he wanted her "out of Missouri." The parties also had conversations about arrangements for Elledge to pay Solomon and Sander $5,000 when they arrived in Detroit. After the seized marijuana was weighed in Missouri, federal authorities flew Solomon and Sander to Detroit, along with the marijuana and the Nevada license plate from their minivan.[1] In Detroit, the marijuana was re-weighed, photographed and videotaped. The duffle bags were then packed with sham packages and loaded into a nearly identical minivan for the controlled delivery.

As planned in phone conversations with Solomon, Elledge drove to a hotel parking lot, entered the rental van, removed a key from under the mat, and attempted to drive away. Elledge was arrested and officers seized his cell phone (later determined to be the phone used to communicate with Solomon), an airline ticket stub, $5,139 in cash, and jewelry valued at $29,050. Officers also found a scale capable of weighing 400 pounds in Elledge's vehicle.

In exchange for their cooperation, neither Solomon nor Sander were indicted for their involvement in the offenses. At trial, Solomon testified to the aforementioned events and also stated that she had driven a load of marijuana from Arizona to Michigan for Elledge twice in the past, in August and October of 2002. The government presented evidence of hotel, airline, credit card, and rental car records for those time periods to corroborate Solomon's testimony. Sander also testified to his involvement in the aforementioned events, explaining that he had become

---

[1] Agents determined that it was important that the minivan used in Detroit appear nearly identical to the van that was rented by Solomon because Elledge had seen the vehicle in Phoenix and personally loaded the marijuana into it.

involved at Solomon's request and that he had never personally spoken to or met Elledge. The government also presented evidence from law enforcement agents who weighed the marijuana seized from the minivan in Missouri and Michigan. The agents stated that the gross weight of the marijuana was 297 pounds (approximately 135 kilograms), that the packaging likely weighed one to two pounds, and that it was "not at all" possible that the net weight of the marijuana was less than 220 pounds (100 kilograms).[2]

Elledge challenged the weight of the marijuana that was seized and emphasized that the agents did not maintain notes or receipts that would corroborate the weights of the packages, that the scales used by agents did not print out a weight ticket and were not regularly certified, that the government's photos only revealed a weight marking on the outside of one bundle, and that Elledge did not have a proper opportunity to contest the government's findings because the marijuana was destroyed after it was weighed and videotaped. Elledge also challenged the chain of custody of the marijuana, noting that the Missouri agent did not transport the marijuana to the airport and that the unidentified person who transported the marijuana to the airport did not testify at trial. The jury convicted Elledge of both counts but returned a special verdict form specifying that the associated drug quantity was 50 to 100 pounds, as opposed to the over 100 pounds charged in the indictment.

---

[2]Mark Williams, a former detective at the Missouri Sheriff's Department, testified that he individually weighed each of the sixteen bundles of marijuana that were seized and that the total weight was 297 pounds. He testified that the weight included the wrapping of the marijuana, but that it was not possible that the marijuana weighed less than 220 pounds in total. Drug Enforcement Agency ("DEA") Agent Ross Roel testified that he weighed each of the 16 bundles in Michigan, marked the weight on each package, and used a calculator to arrive at a gross weight of 297 pounds.

Elledge's Presentence Report ("PSR") scored an offense level of 26 based on 100 to 300 kilograms of marijuana and recommended that he be sentenced as a career offender pursuant to U.S.S.G. § 4B1.1. Elledge contested the drug quantity underlying the offense level and the career offender designation. The district court found the relevant drug quantity to be 50 to 100 kilograms but agreed that Elledge was a career offender. This resulted in a Guidelines range of 262 to 327 months and the court sentenced Elledge to 262 months of imprisonment on each count to be served concurrently.

On direct appeal, Elledge argued that the sentencing court erred in sentencing him as a career offender because one of his prior convictions did not qualify as a predicate offense. While the appeal was pending, the government and Elledge entered into a stipulated agreement wherein Elledge dismissed the appeal and this Court remanded the case for resentencing. At resentencing, the government no longer argued that Elledge was a career offender but argued that the district court should hold him accountable for more than 100 kilograms of marijuana, that his guidelines range should be enhanced for his supervisory role in the offense, and that the court should depart from the Guidelines in light of his criminal history. Elledge objected to each of these positions. More specifically, he argued that while the court was not bound by the jury-determined range of 50 to 100 kilograms, the court should adhere to it and use the most conservative offense level consistent with that range (level 20, corresponding to 40 to 60 kilograms of marijuana). Without addressing that argument directly, the Court determined that Elledge's base offense level was 24 based on a drug quantity of 80 to 100 kilograms of marijuana and stated that the two-point supervision enhancement was a "close question" but appropriate under the facts of the case. The court therefore assigned an offense level of 26, corresponding to a Guidelines range of 120 to 150

months, and sentenced Elledge to 132 months of imprisonment to run concurrently on both counts with credit for time served. Elledge filed a timely notice of appeal and the matter is now before this Court.

## DISCUSSION

### I.

Elledge first argues that the court's unsupported drug quantity finding led to an improper calculation of his base offense level under the Guidelines. While Elledge styles this issue as an erroneous factual finding, his argument is essentially one of procedural error.[3]

On appeal, sentences are reviewed for reasonableness under an abuse of discretion standard. *United States v. Booker*, 543 U.S. 220, 260-61 (2005); *United States v. Sedore*, 512 F.3d 819, 822 (6th Cir. 2008). As part of the reasonableness inquiry, an appellate court must ensure that the district court did not commit significant procedural error, such as:

> failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately

---

[3]In the first issue of Elledge's brief, he argues that "the district court clearly erred in its unsupported finding of fact that defendant should be held accountable for 80-100 kilograms of marijuana for purposes of determining his advisory guideline range." Elledge Br. at 22. While he presents the issue as one of fact, the substance of his argument challenges the court's *procedure* in addressing his argument. *See* Elledge Brief at 24 (stating that he repeatedly argued for a lower base offense level and drug quantity in light of the facts of his case and relevant case law, but that "[t]he court did not explain why it picked BOL 24 (80-100 kg) or why it rejected BOL 20 or 22 or address Defendant's reliance on *Walton*[.]"). In Elledge's fourth assignment of error, he argues that his sentence is procedurally unreasonable, that the "incorrect scoring of a guideline range is significant procedural error[,]" and that "[i]f this Court determines that the district court erred in its determination of Defendant's guideline range, Defendant's sentence must be vacated." Elledge Br. at 33-34. Because the substance of Elledge's argument is one of procedural reasonableness, we will address it as such. Based on above-quoted arguments and Elledge's objections at trial, he has sufficiently raised and preserved the issue for our review.

explain the chosen sentence-including an explanation for any deviation from the Guidelines range.

*Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 597 (2007). This Court grants a presumption of substantive reasonableness to sentences within the advisory Guidelines range. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006); *see also Rita v. United States*, 551 U.S. 338, 346 (2007) (approving of presumption).

At trial, there was a dispute as to the quantity of drugs associated with Elledge's conduct. The government presented witnesses who claimed that the gross weight of the marijuana seized by agents was 297 pounds (approximately 135 kilograms), and that the net weight, excluding an estimated one to two pounds of packaging, was well above the charged 100 kilograms. Elledge, however, challenged the chain of custody of the drugs, the lack of documentation supporting the weights, and, most significantly, the government's destruction of the drugs and packaging prior to trial. The jury, apparently crediting some of Elledge's arguments, returned a special verdict form that specified that Elledge's conduct involved 50 to 100 kilograms of marijuana, as opposed to the "over 100 pounds" charged in the indictment.

At resentencing, although Elledge conceded that the court was entitled to reject the jury-determined range of 50 to 100 kilograms for the purposes of sentencing, he argued that the court should adhere to it given the weaknesses of the government's proofs on the matter. The court explicitly agreed with the 50 to 100 kilogram range and expressed its dissatisfaction with the DEA's stated policy of destroying drugs prior to trial which, in its assessment, deprived Elledge of his right to challenge the evidence as to chain of custody, quality, and quantity.

This did not resolve the issue, however. Elledge further argued—both in his sentencing memorandum and at his resentencing hearing—that the 50 to 100 kilogram range corresponded to three possible offense levels (level 20 for 40 to 60 kilograms of marijuana, level 22 for 60 to 80 kilograms, and level 24 for 80 to 100 kilograms), and that under *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990),[4] the court should use most conservative estimate.

After reiterating Elledge's *Walton* argument at the resentencing hearing, defense counsel stated at least three times that the judge would need to decide which offense level (20, 22, or 24) would apply. The court—apparently misunderstanding the argument—repeatedly stated that it chose a range of 50 to 100 kilograms. Finally, after the government joined in prompting the court that it would need to select an offense level of "20, 22, or 24," the court stated that "the base offense level that I intended to pick was 24. That was the base offense level." (Trial Tr. vol. 8 at 38.) The court did not discuss the matter further.[5]

---

[4]In *Walton*, this Court stated:

> We believe that the guidelines do not permit the District Court to hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible. [ . . . .] Thus when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution.

908 F.2d at 1302.

[5]The court did not ask the parties if they objected to the sentence that was imposed, and the government does not argue that plain error review should apply under *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008), and *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004).

On appeal, Elledge argues that the district court "simply announced it had selected a base offense level of 24" without addressing his arguments for a lower level. We agree and hold that the court committed procedural error by failing to address Elledge's non-frivolous arguments for a lower sentence. Procedural reasonableness requires, among other things, that a district court properly calculate the Guidelines range and that it "adequately explain the chosen sentence." *Gall*, 128 S. Ct. at 597. In light of this obligation, this Court consistently has held that, "[w]hen a defendant raises a particular[, nonfrivolous] argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and *that the judge explained the basis for rejecting it.*'" *United States v. Lalonde*, 509 F.3d 750, 770 (6th Cir. 2007) (internal quotation marks omitted) (emphasis added); *see also United States v. Peters*, 512 F.3d 787, 789 (6th Cir. 2008) (holding that a sentence is not procedurally reasonable if, "[w]hen the defendant or prosecutor 'presents nonfrivolous reasons for imposing a different sentence,'" a sentencing judge fails to "address the 'parties' arguments' and 'explain why he has rejected those arguments'") (quoting *Rita*, 127 S. Ct. at 2468)); *United States v. Jackson*, 408 F.3d 301, 305 (6th Cir. 2005) (requiring an "articulation of the reasons the district court reached the sentence ultimately imposed.").[6] As such, when Elledge offered non-frivolous arguments in favor of a lower offense level, the court had an obligation to articulate its reasons for the selecting the offense level it chose.

---

[6]The above-cited cases are all consistent with the *Gall* Court's observation that courts may be required to explicitly address relevant issues expressly raised by the parties. 128 S. Ct. at 599 ("Had the prosecutor raised the issue, specific discussion of the point might have been in order[.]").

Here the record plainly demonstrates that the district court failed to satisfy this requirement. Elledge repeatedly argued that an offense level of 20 should apply under the circumstances of the case and in light of *Walton,* but the court offered no explanation as to why it selected an offense level of 24. Based on the record before it, we can only speculate as to the reasoning underlying the offense level (and the associated drug quantity) that the sentencing court chose, and it cannot be said that the court "provide[d] a clear explanation of why it has either accepted or rejected the parties' arguments and thereby chose the particular sentence imposed[.]" *United States v. Bolds*, 511 F.3d 568, 580 (6th Cir. 2007). The sentence imposed was therefore procedurally unreasonable and we will remand for resentencing.

## II.

In his second assignment of error, Elledge argues that the district court clearly erred in enhancing his base offense level by two levels for his role as an "organizer, leader, manager, or supervisor" of Nigest Solomon under U.S.S.G. § 3B1.1.

This Court reviews a district court's factual findings for clear error. *United States v. Walls*, 546 F.3d 728, 735 (6th Cir. 2008). A decision is clearly erroneous when this Court has a "definite and firm conviction that a mistake has been made." *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008). However, as to the court's legal conclusion on whether to impose a leadership enhancement under § 3B1.1, this circuit has mixed authority regarding whether a reviewing court should apply a *de novo* standard or a more deferential standard. In *United States v. Young*, this Court summarized the "unsettled" state of the law in this area as follows:

> When reviewing § 3B1.1(a) impositions in the past, 'we reviewed the district court's factual findings for clear error and its legal

conclusions de novo.'" [*Walls*, 546 F.3d at 734] (quoting *United States v. McDaniel*, 398 F.3d 540, 551 n.10 (6th Cir. 2005)). "However, in 2001, 'the Supreme Court ruled in *Buford v. United States* that, in light of the fact-bound nature of the legal decision, an appellate court should review deferentially, rather than de novo, a district court's application of U.S.S.G. § 4B1.2.'" *Id.* (quoting *McDaniel*, 398 F.3d at 551 n.10). Some cases in this circuit suggest, without discussing *Buford*, that "'[a] district court's determination regarding a defendant's role in the offense is reversible only if clearly erroneous.'" *United States v. Jeross*, 521 F.3d 562, 579 (6th Cir. 2008) (quoting *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. [2006]) . . . . Other cases state that "[w]e have not settled the question of what standard governs review of a sentencing enhancement under U.S.S.G. § 3B1.1." *United States v. Moncivais*, 492 F.3d 652, 660 (6th Cir. 2007).

553 F.3d 1035, 1052-1053 (6th Cir. 2009). Because we conclude that Elledge is not entitled to relief under any standard of review, we need not decide whether we owe deference to the district court's decision to impose a leadership enhancement under § 3B1.1.

When deciding whether a supervisory enhancement should apply, a district court should consider:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

18 U.S.C. § 3B1.1 cmt. n.4 (2009).

In the instant case, the district court determined that "based upon Miss Solomon's testimony and the constant phone calls or calling you, you calling her for directions, her calling you for directions, your giving her directions, I think that you were a supervisor." (Trial Tr. vol.

8 at 36.) The court also stated that "the evidence fairly taken reflects that Mr. Elledge was the brains behind the operation. He conceived it. He planned it." (*Id.* at 18.)

The record supports the court's imposition of the enhancement. Although Elledge argues that he and Solomon were equals or "joint-venturers," the government presented evidence that Elledge recruited Solomon for at least two trips, that he instructed her to rent a vehicle with Nevada license plants to avoid suspicion, that he instructed her to take a particular route through Missouri, and that he gave her directions regarding how to rent the vehicle and what credit card to use. In addition, there is evidence that Elledge spoke to Solomon on seven recorded calls and dozens of other unrecorded calls in the course of the trip, and that in the recordings, Elledge repeatedly inquired as to Solomon's progress, reminded her not to speed, instructed her continue driving despite her stated illness, and expressed frustration with her lack of progress. Finally, there is evidence that Elledge intended to pay Solomon $5,000 for her services, but that the load of marijuana could be sold in Detroit for a profit of $300,000 or more.

This Court has upheld § 3B1.1 enhancements in similar cases. In *United States v. Munoz*, we found that a supervisory role existed when the defendant "made arrangements for the courier to deliver the drugs," was in "repeated contact" with the informant, and "played a role in coordinating the delivery and payment for" the drugs. 233 F.3d 410, 416 (6th Cir. 2000). Likewise, in *United States v. Gaitan-Acevedo*, we found that an enhancement was appropriate when the defendant gave directions to a courier as to when a delivery was to be made and made arrangements for the courier when his vehicle broke down, and when a second courier possessed the defendant's telephone number as a contact person. 148 F.3d 577, 595-96 (6th Cir. 1998). Because Elledge's conduct is markedly similar to the conduct discussed in *Munoz* and *Gaitan-*

*Acevedo*, and because the evidence clearly indicates that Solomon was acting under his direction, the district court did not err in applying an enhancement under § 3B1.1, regardless of the standard of review that is applied.

Elledge also challenges the application of the enhancement by arguing that the district court violated his Sixth Amendment right to a jury verdict under *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), by engaging in judicial fact-finding to determine by a preponderance of the evidence that he played a supervisory role in the offense. This argument lacks merit in light of relevant Supreme Court precedent. In *Booker*, the Supreme Court held that while the Sixth Amendment is violated when a sentencing judge makes factual findings that determine a *mandatory* guideline range, an *advisory* Guidelines system would not violate the constitutional right to trial by jury. 543 U.S. at 233. This Court has since made clear that so long as a sentencing court does not treat the Guidelines as mandatory, it is permissible for the court to make factual findings in the course of calculating advisory Guidelines. *United States v. Kosinski*, 480 F.3d 769, 774-77 (6th Cir. 2007); *United States v. Gardiner*, 463 F.3d 445, 461 (6th Cir. 2006). Elledge does not argue that the court viewed the Guidelines as mandatory, and our review of the record reveals that court did not consider itself bound by the Guidelines. Consequently, the district court's fact-finding with respect to Elledge's supervisory enhancement did not violate the Sixth Amendment.

Finally, Elledge argues that the sentence imposed by the district court was procedurally unreasonable in light of the improper application of the § 3B1.1 supervisory enhancement.[7]

---

[7]With respect to his claim alleging an improper § 3B1.1 enhancement, Elledge does not argue that the court failed to articulate the reasons underlying its application of the enhancement, and the record would not support such an argument.

Because the court's application of the contested enhancement was not in error, Elledge's procedural reasonableness argument with respect to this issue also fails.

## CONCLUSION

For the reasons stated above, we **REVERSE** the district court's judgment and **REMAND** for resentencing.

**ROGERS, J., dissenting**. I respectfully dissent from the determination that reversal is required by the failure to explain how the guideline range was arrived at. While it is important for a district court to make clear how its guideline calculation is made, in this case the reasoning is obvious from the record. The evidence clearly showed that the amount of marijuana exceeded 100 kg, but the court decided to defer to the jury's determination that the amount was between 50 kg and 100 kg. The court was not required to defer to the jury verdict, but made that determination in its discretion. That discretionary exercise of deference to the jury did not require the court to go further and pick the lowest guideline range within the range found by the jury, and the district court declined to do so. Additional explanation would have been helpful, but was not required.

All of the evidence showed that Elledge was responsible for a drug quantity that far surpassed the range found by the jury. Both the detective from the Missouri Sheriff's department and the DEA agent testified that the gross weight of the marijuana was 134.7 kg (297 lbs), including the wrapping but not including the duffel bags. Both witnesses also testified that the wrappings weighed only a few pounds—one set of the wrapping weighed 0.24 lbs, and if that weight was consistent for all the packages, the sixteen wrappers together would have weighed 3.87 lbs. The district court made a determination to cap the amount for sentencing purposes at the highest range consistent with the jury verdict, after expressing its dissatisfaction with the DEA's policy permitting the pre-trial destruction of the drugs. No further explanation was reasonably required as to why the court capped the drug amount without reducing it more than necessary—doing so was all that was necessary to achieve the court's purpose of conforming to the jury's verdict, and thereby expressing dissatisfaction with the DEA policy.

The district court did not need to "err on the side of caution," under *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990). That admonishment applies when the court is "choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity," *id.*, or when "the amount of drugs is uncertain," *United States v. Long*, 190 F.3d 471, 478 (6th Cir. 1999). But the district court was not uncertain about the amount of drugs in this case. All of the available evidence suggested that Elledge was actually responsible for more than 100 kg of marijuana. The court's decision to find less than 100 kg of marijuana had nothing to do with uncertainty, and had only to do with deference to the jury and concern about DEA evidence-preservation policy. Neither concern plausibly suggested an amount less than 80 kg.

I agree with the other parts of the majority opinion and I would therefore affirm the sentence of the district court.