NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0141n.06

No. 08-2552

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Mar 05, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **PATRICK J. HARRINGTON**, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant.* | ) | |

BEFORE:     SUHRHEINRICH, COLE, and GILMAN, Circuit Judges.

**COLE, Circuit Judge.** Defendant-Appellant Patrick J. Harrington challenges his 120-month sentence for conspiracy, in violation of 18 U.S.C. § 371, and making false declarations before a federal grand jury, in violation of 18 U.S.C. § 1623. For the reasons explained below, we **AFFIRM** his sentence.

**I. BACKGROUND**

From 2001 until 2006, Harrington was an executive vice president of Business Loan Express, LLC ("BLX") and manager of its Troy, Michigan office. During Harrington's tenure, BLX was a preferred lender under the guaranteed-loan program operated by the Small Business Association ("SBA"), meaning that the SBA delegated loan approval, closing, and servicing authority to BLX. As a BLX executive vice president and manager, Harrington performed and oversaw these services on behalf of the SBA.

Harrington used his position at BLX to carry out a fraudulent loan scheme. The scheme worked as follows. Typically, the fraudulent loans involved one to five individuals or groups of individuals (brokers) who orchestrated the purchase and resale of gas stations, convenience stores, party stores, restaurants, or small motels. A broker would locate, and sometimes buy, the property and then find a person to buy the property at an inflated price using an SBA-guaranteed loan issued by BLX. In some instances, the purchaser was truly interested; in others, the purchaser was a "straw buyer" who did not intend to operate the business or make loan payments but was promised payment by the broker to serve as the buyer. In order to qualify the buyers for SBA-guaranteed loans, Harrington, the brokers, and the buyers would misrepresent the buyers' financial status or work experience, misrepresent whether the buyer was a United States citizen, conceal and cover-up the fact that someone other than the alleged buyer was going to be the beneficial owner or operate the business, overstate the value of the property, and fraudulently document that the buyer made the required equity-injection payments. The broker profited from the mark-up in the price of the property by receiving a percentage of the purchase price. Harrington profited because his compensation was based, in part, on the number and amount of loans he originated. In all, Harrington fraudulently originated and issued eighty-nine SBA-guaranteed loans and two loans with Community South Bank. The total amount of unlawfully obtained loans was $84,949,000.00.

In addition to the fraudulent loan scheme, Harrington knowingly made a false, material declaration under oath before a grand jury that was investigating SBA loan fraud. Harrington answered questions related to a BLX-issued, SBA-guaranteed loan, claiming to have no knowledge that the declarations used to satisfy the equity-injection requirement of the loan were fraudulent. In

truth, which Harrington knew, the loan packages relied on fraudulent documentation.

On October 1, 2007, pursuant to a plea agreement with the Government, Harrington pleaded guilty to conspiracy and making false declarations before a grand jury. The district court accepted the plea agreement and Harrington's guilty plea. The United States Probation Office then prepared a presentence report ("PSR") and calculated the applicable sentencing range. For the conspiracy charge, the base level offense was six. Because the loss or intended loss attributed to Harrington was between $20,000,000 and $50,000,000, the base offense level was increased by twenty-two levels. Next, the enhancement in U.S.S.G. § 3B1.1 was applied and the offense level was increased by four because Harrington was an organizer or leader of a criminal activity. In addition, the offense level was increased by two pursuant to U.S.S.G. § 3B1.3 because Harrington "abused a position of public or private trust." Thus, the adjusted offense level for the conspiracy charge was thirty-four. The PSR also calculated an offense level of fourteen for the false declarations charge, with no adjustments. Next, the PSR applied the multiple-count adjustment, which meant that thirty-four became the adjusted offense level. Finally, the PSR deducted three levels for acceptance of responsibility. Because Harrington has no criminal history, he was placed in a Criminal History Category I. Based on a total offense level of thirty-one and a Criminal History Category I, the PSR calculated the guideline range at 108 to 135 months. However, because each count carries a maximum sentence of five years, the PSR reduced the top of the guideline range to 120 months.

At the sentencing hearing, Harrington's counsel argued that the leader-of-criminal-activity enhancement and the abuse-of-trust enhancement were inappropriate. The district court disagreed, accepted the PSR-calculated guideline range, and sentenced Harrington to 120 months of

imprisonment, to be followed by two years of supervised release. The court also assessed a special fine of $200,000.

Harrington appealed.

## II. ANALYSIS

Harrington raises two issues on appeal. First, he argues that the district court erred by applying the four-level enhancement in U.S.S.G. § 3B1.1(a) to his offense level, claiming that he was not a leader or organizer of criminal activity. Second, he disagrees with the district court's decision to apply the two-level enhancement in U.S.S.G. § 3B1.3 to his offense level because, in his view, he did not violate a position of trust.

### A.      U.S.S.G. § 3B1.1(a)

The standard of review that this Court applies to a district court's imposition of a leader or organizer enhancement under U.S.S.G. § 3B1.1(a) is "subject to some debate." *United States v. Walls*, 546 F.3d 728, 734 (6th Cir. 2008) (quoting *United States v. McDaniel*, 398 F.3d 540, 551 n.10 (6th Cir. 2005)). In the past, this Court reviewed a district court's factual findings for clear error and its legal conclusions de novo. *Id.* But in *Buford v. United States*, 532 U.S. 59 (2001), the Supreme Court held that the "fact-bound nature" of the § 4B1.2 sentencing enhancement requires an appellate court to review deferentially, rather than de novo, a district court's application of U.S.S.G. § 4B1.2. *Id.* at 66. A § 3B1.1(a) determination is similarly fact-bound; thus, *Buford*'s deferential standard of review might apply. However, several panels of this court have found it "'unnecessary to determine whether *Buford* requires us to alter the standard of review we apply in reviewing § 3B1.1 enhancements because [each panel] would have affirmed the district court's sentencing

determination under either standard.'" *Walls*, 546 F.3d at 734 (quoting *McDaniel*, 398 F.3d at 551

n.10). Like the panels that have come before us, we conclude that it is unnecessary to decide which

standard of review applies because Harrington's sentence withstands scrutiny under either standard.

U.S.S.G. § 3B1.1(a) provides that if "the defendant was an organizer or leader of a criminal

activity that involved five or more participants or was otherwise extensive," the sentencing court

must apply a four-level increase to the defendant's offense level. To impose an enhancement under

§ 3B1.1(a), a court must find that the defendant "exerted control over at least one individual within

a criminal organization." *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000) (internal

quotation marks omitted). In addition, when determining whether to apply the enhancement, the

court considers

> the exercise of decision making authority, the nature of participation in the
> commission of the offense, the recruitment of accomplices, the claimed right to a
> larger share of the fruits of the crime, the degree of participation in planning or
> organizing the offense, the nature and scope of the illegal activity, and the degree of
> control and authority exercised over others.

*McDaniel*, 398 F.3d at 551 (quoting U.S.S.G. § 3B1.1 applic. n.4). "It is not necessary that a

defendant meet each of these requirements." *United States v. Alepin*, 296 F. App'x 509, 514 (6th

Cir. 2008). Instead the "key issue" is the "defendant's relative responsibility." *Id.* (internal

quotation marks omitted).

Harrington makes two arguments that the district court erroneously applied the enhancement.

First, he contends that he did not have a "claimed right to a larger share of the fruits of the crime"

because he did not share in the loan proceeds. But, as he admits, his compensation at BLX was

based, in part, on the total amount of loans that BLX processed, and his compensation was

significant—from 2001 to 2006, he received $4,730,404.98 in compensation. Perhaps the brokers involved in the scheme benefitted more on individual loans, but Harrington's share for the entire scheme was sizable. In *United States v. Moncivais*, this Court affirmed an enhancement under § 3B1.1, in part, because the defendant had a "large stake in the profitability" of the conspiracy. 492 F.3d 652, 661 (6th Cir. 2007) (internal quotation marks omitted). The same was true here—the more successful the conspiracy, the more compensation Harrington received. We therefore reject Harrington's argument that he did not share a large enough portion of the fruits of the crime to justify the enhancement.

Second, Harrington claims that the brokers were the actual orchestrators of the scheme and that he did not oversee other members of the conspiracy. Again, the record indicates otherwise. Harrington identified several BLX employees, two of whom worked for him in the Troy office, who processed the fraudulent loans. Harrington argues that these employees were simply processing the fraudulent loans as they would have processed any other loan and, therefore, Harrington had no need to direct them. This defies reason. As their supervisor, Harrington managed them and approved—or disapproved—of their actions. In addition, the Government offered specific examples of how Harrington exercised authority over other members of the conspiracy. For instance, on February 28, 2006, Harrington was recorded in a conversation with a co-conspirator. During the conversation, Harrington instructed the co-conspirator to lie to a federal agent about their scheme. The conversation also showed Harrington's awareness of the other co-conspirators' roles and actions. Similarly, Harrington took the lead on contacting a number of banks in an effort to cover-up and prolong the fraud after banks began asking questions.

Finally, and perhaps most important, Harrington was the common thread uniting the scheme. Harrington worked with five independent brokers who directed fraudulent loans to him, but Harrington was the single person in the conspiracy who had a role in each of the eighty-nine fraudulent loan transactions. This fact also defeats Harrington's argument that his co-conspirators had equal culpability. To the contrary, without Harrington, the scheme could not have succeeded—he was the necessary element. Thus, we affirm the district court's finding that Harrington was a "leader or organizer of criminal activity" under U.S.S.G. § 3B1.1(a).

**B.     U.S.S.G. § 3B1.3**

Like U.S.S.G. § 3B1.1(a), the standard of review which applies to U.S.S.G. § 3B1.3 is subject to some debate. *Compare United States v. May*, 568 F.3d 597, 602 (6th Cir. 2009) ("We review *de novo* the District Court's determination that [the defendant] occupied a position of trust for the purpose of the Sentencing Guidelines.") (internal quotation marks omitted) (alteration in original), *with United States v. Lang*, 333 F.3d 678, 682 (6th Cir. 2003) (applying *Buford*'s clearly-erroneous standard where the district court's application of § 3B1.3 is fact-bound). But we again conclude that the standard of review does not matter because the district court's determination would withstand scrutiny under either standard.

Under U.S.S.G. § 3B1.3, "[i]f a defendant abused a position of public or private trust," his offense level should be increased by two levels. As an initial matter, Harrington argues that he did not have a position of trust with the SBA, the victim of the offense. Harrington relies on *United States v. Moored*, 997 F.2d 139 (6th Cir. 1993), for this argument. In *Moored*, the defendant used his relationship with a third party to carry out a scheme to defraud. *Id.* at 140-41. This Court

reversed the abuse-of-trust enhancement because the entity with which the defendant had a relationship of trust was not the victim of the offense of conviction. *Id.* at 145. The Court noted that the defendant's "position of trust was with a third party," and, thus, the defendant's position of trust had only a "remote connection" to his crime. *Id.* at 144-45. Harrington argues that the same is true here: his position of trust was with BLX (a third party), and the victim was the federal government (a party with whom he did not have a position of trust).

Harrington's argument misses the mark. As explained above, the SBA has preferred lenders, and these lenders are given great latitude in processing SBA-guaranteed loans. BLX was a preferred lender under the SBA's commercial-loan program, and Harrington served as a BLX executive vice president and managed a BLX branch. Per agreements between the SBA and BLX, the SBA delegated authority to BLX to originate and process financially sound loans, and the SBA trusted BLX management to follow SBA regulations. Thus, we conclude that Harrington held a position of trust with the SBA. *Cf. United States v. Sedore*, 512 F.3d 819, 826 (6th Cir. 2008) (rejecting defendant's argument based on *Moored* and "extending the position of trust that the [d]efendant held with [the victim's father] to the [victims]").

Harrington also argues that, even if he held a position of trust with the SBA, the enhancement does not apply because he did not have managerial discretion. The enhancement's Application Note 1 offers guidance on this point. The Note explains that "[t]his adjustment, for example, applies in the case of . . . a bank executive's fraudulent loan scheme . . . [but not] in the case of an embezzlement or theft by an ordinary bank teller." U.S.S.G. § 3B1.3 (applic. n.1). This is so because such positions are not characterized by "managerial discretion." *Id.* Harrington claims that

he is more like a bank teller than a bank executive because others at BLX were responsible for final loan approval and, without more discretion, he cannot be held responsible under § 3B1.3. This argument might be plausible if Harrington was a low-level loan processor. But, as described above, he was a branch manager and held the title of executive vice president. In fact, as an agent of a preferred lender, Harrington had signing authority on behalf of the SBA to originate and process loans. Accordingly, he enjoyed a great deal of discretion—for instance, he admitted that he knew that a number of his subordinates were submitting fraudulent loans for approval and, instead of exerting his authority to halt the fraud, he approved the applications. Moreover, the authority he derived from his position enabled him to facilitate and perpetuate the fraudulent loan scheme. It is hard to imagine how Harrington would have been able to accomplish his fraud without his high-level position at BLX or without the authority that the SBA gave to BLX management. Thus, we agree with the district court that as a branch manager and executive vice president, Harrington enjoyed managerial discretion as defined by U.S.S.G. § 3B1.3.

In sum, Harrington used his position of trust with the SBA to facilitate and perpetuate the fraudulent loan scheme, warranting a two-level enhancement under U.S.S.G. § 3B1.3.

### III. CONCLUSION

For these reasons, we **AFFIRM** Harrington's sentence.