**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0745n.06

No. 11-1862

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

***Jul 11, 2012***

LEONARD GREEN, Clerk

PATRICK J. HARRINGTON,

     Petitioner,

v.

UNITED STATES OF AMERICA,

     Respondent.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

_____/

BEFORE:    COLE and CLAY, Circuit Judges; MATTICE, District Judge.[*]

    **CLAY, Circuit Judge.**  Petitioner Patrick Harrington, a federal inmate convicted of defrauding the United States government, appeals an order denying his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255. Petitioner argues that his attorneys rendered deficient performance during his sentencing proceedings. Because Petitioner's attorneys did not render deficient performance, and because Petitioner was not prejudiced by any decisions of counsel, we **AFFIRM**.

---

[*]The Honorable Harry S. Mattice, Jr., United States District Judge for the Eastern District of Tennessee, sitting by designation.

## BACKGROUND

Petitioner was convicted on two counts of defrauding the United States government after spearheading a fraud against the United States Small Business Administration ("SBA"). Petitioner managed the Troy, Michigan office of Business Loan Express, LLC ("BLX") from 2001 through 2006. In his position as executive vice president of BLX, Petitioner oversaw BLX's participation in an SBA program in which the SBA delegated loan approval, closing, and servicing authority to BLX. In that position, Petitioner participated in an illegal scheme to issue illegitimate SBA-guaranteed loans.

Broadly speaking, the scheme entailed buying properties at inflated prices using SBA-guaranteed loans. The scheme benefitted Petitioner because his compensation increased as the number of SBA-guaranteed loans issued by BLX increased. The panel that affirmed Petitioner's sentence on direct review described the scheme as follows:

> Typically, the fraudulent loans involved one to five individuals or groups of individuals (brokers) who orchestrated the purchase and resale of gas stations, convenience stores, party stores, restaurants, or small motels. A broker would locate, and sometimes buy, the property and then find a person to buy the property at an inflated price using an SBA-guaranteed loan issued by BLX. In some instances, the purchaser was truly interested; in others, the purchaser was a "straw buyer" who did not intend to operate the business or make loan payments but was promised payment by the broker to serve as the buyer. In order to qualify the buyers for SBA-guaranteed loans, Harrington, the brokers, and the buyers would misrepresent the buyers' financial status or work experience, misrepresent whether the buyer was a United States citizen, conceal and cover-up the fact that someone other than the alleged buyer was going to be the beneficial owner or operate the business, overstate the value of the property, and fraudulently document that the buyer made the required equity-injection payments. The broker profited from the mark-up in the price of the property by receiving a percentage of the purchase price. Harrington profited because his compensation was based, in part, on the number and amount of loans he originated. In all, Harrington fraudulently originated and issued eighty-nine SBA-guaranteed loans and two loans with Community South Bank.

*United States v. Harrington*, 367 F. App'x 657, 658 (6th Cir. 2010). All told, the full value of the loans issued as a result of Petitioner's fraud was $84,949,000. *Id.*

Many of the loans entered default and were subsequently liquidated, leading to immense losses for BLX. When federal authorities began investigating this scheme, Petitioner made false and material misrepresentations under oath before a grand jury. Petitioner represented that he was unaware that the declarations used to satisfy the equity-injection requirements of the loans were fraudulent, when, in fact, he knew that the declarations were untrue. Petitioner was indicted in December 2006 on fourteen counts of fraud-related offenses. In 2008 he pleaded guilty to a superseding information charging him with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and making a false declaration before a grand jury, in violation of 18 U.S.C. § 1623.

In his Presentence Investigation Report ("PSR"), Petitioner was assigned a base offense level of six for his conspiracy charge. The PSR recommended an enhancement of 22 points on the ground that a loss of between $20 million and $50 million was attributable to Petitioner. *See* USSG § 2B1.1. Specifically, the PSR held Petitioner responsible for a loss of between $30,362,654 and $32,168,841. (PSR ¶ 21.) The probation office calculated this figure based on the defaults of the fraudulent loans for which Petitioner was responsible for issuing. Petitioner was made responsible for default amounts where BLX had suffered a shortfall after liquidation of the defaulting loan; he was not made responsible for any amount BLX had recouped after a default.

The PSR also recommended a four-point enhancement because Petitioner was an organizer of the fraudulent scheme, *see* USSG § 3B1.1, a two-point enhancement because Petitioner abused

a position of trust, *see* USSG § 3B1.3, and a three-point reduction for acceptance of responsibility, *see* USSG § 3E1.1. The result of these adjustments was a total offense level of thirty-one, which, given Petitioner's lack of criminal history, yielded a Guideline range of 108 to 135 months. The PSR calculation for Petitioner's false-statement charge yielded a base offense level of fourteen and was neither enhanced nor reduced.

In his sentencing memorandum filed in advance of the district court's hearing, Petitioner requested a downward variance on four bases. *See* 18 U.S.C. § 3553(a). Most crucial to this appeal, Petitioner argued that the loss amount attributed to him was too great, reasoning that (1) he did not personally benefit from the loans, but rather assisted others in obtaining loans that he expected would be repaid; (2) the number of defaults on the loans in question was partially attributable to "real estate market conditions and the general state of the local and national economies"; and (3) the single loss figure masked the fact that Petitioner played "an appreciably smaller role" than others in obtaining 39 of the 89 loans. (Def.'s Sent. Memo. 10–13, R. 31, Page ID 155–58.) Petitioner also argued that he was not a leader or organizer of the fraud, that he did not abuse a position of trust, and that a Guideline-range sentence would be disproportionate to the severity of his conduct. The district court denied all of Petitioner's variance requests and sentenced him to 120 months imprisonment. Petitioner appealed the district court's rulings regarding his role in the offense and the abuse of a position of trust, but this Court affirmed. *See Harrington*, 367 F. App'x at 662. Petitioner did not appeal the district court's loss calculation.

In his *pro se* motion to vacate, Petitioner argued that counsel should have objected directly to the PSR's loss calculation, which the district court adopted. According to Petitioner, the PSR's

loss calculation failed to take into account the effect of certain intervening causes of BLX's losses, such as market losses that the SBA and BLX would have incurred on account of risky loan practices unrelated to Petitioner's fraud. Since Petitioner believed the loss attributed to him was inflated, he contended that counsel should have objected to the calculation and that the failure to object prejudiced him. The district court rejected this argument, and Petitioner timely appealed.

## DISCUSSION

### I.      Legal Framework

Section 2255 of Title 28 of the United States Code permits a federal prisoner in custody to challenge his sentence if it "was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). In an appeal of a denial of a § 2255 petition, we review legal issues *de novo* and uphold factual findings of the district court unless they are clearly erroneous. *Adams v. United States*, 622 F.3d 608, 610–11 (6th Cir. 2010).

A defendant is not accorded his Sixth Amendment right to counsel if "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Thus, to prevail on an ineffective assistance of counsel claim, a petitioner "must demonstrate that counsel's representation fell below an objective standard of reasonableness and that the defendant was prejudiced by the ineffective assistance of counsel." *Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000). A defendant is entitled to objectively reasonable representation during the sentencing phase as well as during trial. *See Haliym v. Mitchell*, 492 F.3d 680, 711–12 (6th Cir. 2007).

Representation is deficient under *Strickland* when counsel makes an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To satisfy the prejudice element of *Strickland*, a petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court defines a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.*

Tactical or strategic decisions are presumed "sound" and are therefore "particularly difficult to attack" in a habeas petition. *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994) (quoting *Strickland*, 466 U.S. at 690). In considering a petitioner's ineffective assistance claim, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

## II. Analysis

Section 2B1.1 of the United States Sentencing Guidelines requires a sentencing court to increase a defendant's offense level based on the amount of monetary loss attributable to his crimes. *See* USSG § 2B1.1; *see also United States v. Krimsky*, 230 F.3d 855, 861–62 (6th Cir. 2000). Section 2B1.1 requires a district court to attribute to the defendant "the greater of actual loss or intended loss." USSG § 2B1.1 cmt. n.3(A). When the district court attributes the actual loss to the defendant (as the court appears to have done in this case), the court must find "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1 cmt. n.3(A)(i). The Guidelines define "reasonably foreseeable pecuniary harm" as the "pecuniary harm that the

defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." USSG § 2B1.1 cmt. n.3(A)(iv).

The sentencing court must "only make a reasonable estimate of the loss" attributable to a defendant's fraud. USSG § 2B1.1 cmt. n.3(C). A district court's reasonable estimate must distinguish between "but for" and proximate cause, and the court must use the latter in deciding how many levels to enhance a defendant's sentence. *United States v. Rothwell*, 387 F.3d 579, 583–84 (6th Cir. 2004).

Petitioner contends that counsel performed deficiently by declining to object to the PSR's loss calculation. He argues that the probation office calculated the loss Petitioner caused using the "but for" standard and that it should have been calculated using proximate cause principles. He contends that the district court could have reasonably estimated Petitioner's proximately-caused loss by comparing the default rate of the fraudulent loans Petitioner helped issue with the default rate of similar loans untainted by fraud. Instead of challenging the PSR's loss calculation in this manner, Petitioner contends that defense counsel accepted the loss calculation, a decision he claims was indefensible.

Petitioner's claim is factually unfounded, because it assumes that defense counsel did not contest the amount of loss attributable to Petitioner. Counsel did, in fact, dispute that figure: while counsel did not formally ask the district court not to adopt the PSR's loss calculation, Petitioner's attorneys used a variance request under 18 U.S.C. § 3553(a) to argue that the PSR overstated the loss attributable to Petitioner. *See* 18 U.S.C. § 3553(a) (directing a sentencing court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing).

7

Defense counsel filed a detailed sentencing memorandum in advance of Petitioner's sentencing hearing. In pertinent part, counsel argued that the PSR overstated the amount of loss attributed to him and "exert[ed] too heavy an influence on the sentencing range recommended by the Guidelines." Def.'s Sent. Memo. 10, Page ID 155. As stated by defense counsel, the "22-level enhancement treat[ed] [Petitioner] the same as someone who engages in a 'pump and dump' stock scheme or similar types of fraud where the defendant is *personally* enriched by as much as $50 million," even though Petitioner's "personal gain from the scheme was nowhere near that of other defendants who receive the same loss amount enhancement for their fraud or theft offenses." (*Id.*) Additionally, Petitioner argued that he was heavily involved with the origination of fifty of the offending loans but "played an appreciably smaller role" in the origination of the remaining thirty-nine loans, which were originated primarily by two brokers in Chicago. (*Id.* 12, Page ID 157.)

Finally, and most crucially, defense counsel argued that larger economic factors contributed significantly to the number of defaults on the loans at issue:

> [T]he level and severity of the defaults on the various loans—and the attendant consequences for SBA and BLX—has been accentuated by real estate market conditions and the general state of the local and national economies. Michigan lenders, in particular, have been hit hard. Our State has the highest percentage of troubled banks in the nation. . . . It can hardly be disputed that the sharp and unexpected drop in the real estate market played a significant role in both the default rates and the ability to mitigate losses through the sale of collateral for the loans. To be sure, "but for" the scheme many of these particular borrowers would not have been in a position to default on SBA-guaranteed loans, but in assessing culpability and in determining the necessary level of punishment it is important to ask whether other actors contributed to the loss that has been attributed to [Petitioner].

(*Id.* 11.) In substance, this argument asserts that Petitioner should not have been made responsible for the total effect of the fraudulent loans he helped originate, because the poor regional and national

economy intervened and increased the severity of the defaults. This is a classic proximate cause argument. *See Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 543 (6th Cir. 2000) ("[T]he concept of proximate cause requires . . . reasonable foreseeability and the lack of any independent intervening causes.").

Given that defense counsel made the identical type of argument that Petitioner argues they did not make, Petitioner's ineffective assistance claim boils down to a challenge to defense counsel's method of making this argument. Petitioner faults defense counsel for arguing the issue of loss causation through the avenue of a variance request under 18 U.S.C. § 3553(a) rather than through a direct challenge to the probation office's loss calculation. But no consequence of any significance hinged on defense counsel's chosen avenue for the challenge—except that success on a variance request would have been safer on appeal.[1] *See Gall v. United States*, 552 U.S. 38, 51–52 (2007) (explaining that review of a district court's variance under § 3553(a) is for abuse of discretion); *United States v. Moore*, 582 F.3d 641, 644 (6th Cir. 2009) (explaining that review of mixed questions of law and fact in the application of the Guidelines is *de novo*).

---

[1]On this point, Petitioner offers a scenario in which defense counsel could have taken advantage of both avenues of challenging the loss calculation and availed him of review of the district court's sentence under both the abuse-of-discretion and *de novo* standards of review. According to Petitioner, defense counsel could have challenged the PSR's application of § 2B1.1 in the first instance. If the district court agreed with his argument but this Court reversed while reviewing *de novo*, then defense counsel could have requested a variance pursuant to § 3553(a) at re-sentencing. Plausible or not, this scenario is no basis for concluding that counsel's performance fell outside "the wide range of reasonable professional assistance," particularly when counsel's chosen method of challenging the calculation was a "tactical decision" aimed at appealing to the significant discretion a district court has in varying from a defendant's advisory Guideline range under § 3553(a). *Strickland*, 466 U.S. at 689; *see United States v. Petrus*, 588 F.3d 347, 356 (6th Cir. 2009).

Petitioner also faults counsel for not challenging the loss calculation more vigorously by providing the district court with statistics comparing the loss rates of loans originated by Petitioner with those of loans untainted by fraud. Counsel's decision not to do so is no basis for habeas relief, because the intensity with which counsel pressed their challenge to the loss calculation was a valid tactical decision. *Strickland*, 466 U.S. at 689. Counsel chose to focus their energies on a range of issues raised by the PSR and prepared a seventeen-page sentencing memorandum with unusually elaborate descriptions of Petitioner's personal and family history, his role in the offense, and application of the § 3353(a) factors to his case. We see no reason to second-guess the weight counsel decided to give to these arguments. *See id.* Moreover, any advantage Petitioner would have gained by offering the court statistical information comparing loan default rates would probably have been marginal, making counsel's decision to apply their efforts broadly all the more defensible. Thus, Petitioner cannot overcome the "strong presumption" that counsel's method of contesting loss causation fell "within the wide range of reasonable professional assistance." *Id.*

Even if Petitioner's argument about counsel's performance were more persuasive, we would still conclude that counsel's method of challenging the PSR's loss calculation did not prejudice him. According to Petitioner, counsel's failure to object using the correct standard cost Petitioner a 22-point enhancement, increasing the low end of his Guideline range from four to 108 months. This argument is misleading. It assumes that a successful challenge of the PSR's application of § 2B1.1 could have resulted in no loss enhancement, but that result was implausible. Even if counsel had convinced the district court that the PSR overstated the loss attributable to Petitioner, counsel had to convince the court that the amount was overstated by over $12 million to obtain even a two-point

reduction in his § 2B1.1 enhancement and by $25 million to obtain a four-point reduction. Counsel's § 3553(a) argument did not convince the district court to reduce the loss attributed to Petitioner by these amounts. A direct attack on the PSR's loss calculation was no more likely to do so, because, as we have explained, the type of argument necessary to succeed in challenging loss causation by either method is the same.

Petitioner relies heavily on *United States v. Rothwell*, a case in which we described the proper method of calculating loss under § 2B1.1, but *Rothwell* is unhelpful to him. In *Rothwell*, a defendant purchased two properties to refurbish and obtained an SBA loan to fund work on only one of those properties. *Rothwell*, 387 F.3d at 581. The defendant used a portion of that loan to fund work on the other property but submitted invoices to the SBA stating that he used the loan to fund work on the SBA-funded property. *Id.* The defendant reimbursed the SBA by eventually using his own money to fund work on the SBA-funded property. *Id.* However, the defendant later defaulted on the SBA loan, and the SBA foreclosed on the property and sold it at a substantial loss. *Id.*

In sentencing the defendant on his conviction for mail fraud, the district court calculated loss as a share of the amount the SBA lost in the foreclosure sale. *Id.* at 581–82. We remanded, concluding that the district court "ignored the causation requirement inherent in the rules for determining loss." *Id.* at 583. We reasoned that the defendant's act of submitting false invoices could not "be reasonably considered to have caused the SBA's loss under either a 'but for' or legal cause analysis." *Id.* at 584. Rather, we considered there to be "myriad explanations for the default" and foreclosure, such as poor business judgment or larger economic forces, which we considered "more likely causes than the fraud-induced progress payment." *Id.*

*Rothwell* sheds no light on the central issue implicated by Petitioner's claim—namely, whether counsel rendered ineffective assistance by contesting the PSR's loss calculation through the avenue of § 3553(a). *Rothwell* stands for the uncontested proposition that a sentencing court applying § 2B1.1 must make a reasonable estimate of loss using proximate cause as its measure. In this case, counsel argued that the PSR's loss calculation overstated Petitioner's responsibility for the SBA's losses, and they did so in a method that sufficiently vindicated Petitioner's right to a specific factual finding on loss causation by the district court, even if Petitioner is now dissatisfied with that finding. Counsel urged the district court to comply with the rule that *Rothwell* stands for, and therefore *Rothwell* does not suggest that counsel's performance was objectively unreasonable.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.